Thank you, Your Honor. My name is Hugh Moore of the Chattanooga Bar. I'm here with Nate Kennard of the Chattanooga Bar, an associate in my firm. I represent Mr. Larry Braswell. Following a jury trial, Mr. Braswell was found guilty of being a felon in possession of a weapon. He was sentenced to 235 months in prison, almost 20 years. I would like, first of all, to discuss issues three and four that we raise in our brief. The issues are intertwined, mutually dependent, and the issues are the sufficiency of the evidence and the prosecutor's statement to the jury of what he thought was said on an audio recording and a statement in which he was not in evidence. Let me ask you a preliminary question. If you lose on all of your questions about what evidence should have been in or out, wasn't there clearly sufficient evidence for a reasonable juror to conclude guilt? No, Your Honor. I submit that there is not What I said to you is if you lose on all your evidentiary issues and everything that came into that case was properly before the jury, wasn't there sufficient evidence for a reasonable juror to conclude guilt? Again, I would say no, because on the recording, Judge Mattis, in his order on a motion for a new trial motion for acquittal, Judge Mattis went back and that the jury listened to it. He did not hear the words, my, the possessory words. I understand you're challenging that, but my question was if that was properly put before the jury, then clearly in this case there was sufficient evidence. If everything that came in was properly in, you would have no insufficiency of the evidence question, would you? I don't believe that the, I would submit to the court that the recording does not, does not, is not a confession and that without that confession that there's not sufficient evidence, no. So at best there's reference to something that they may have found or whatever, but you're saying he never says it's my gun and then the circumstances are such that you can't legitimately infer that the gun and marijuana was his because so many people had access or? Well, and that's what I, and because there's no connection whatsoever to him, but yes, I believe that's true. Judge Mattis, and this is at page 1207 of the record, in the order on the motion for a new trial motion for acquittal, he goes back and you may recall from the briefs, in the early hearings, Judge Mattis says, I can't understand what's on the tape. I don't have any idea what's on it. I just hear a bunch of curse words. And then we have the trial and at, and then I file my motions and Judge Mattis in his order says, I go back, I listen to it on the same equipment that the jury used. To me, it is easily discernible that defendant says at time stamp 1949-13, expletive, man, comma, mother, expletive, wand, period. Prints all over this mother, expletive, period. And what's missing there and what's so important is the prosecutor argued that this was a confession. The prosecutor's argument, his opening and closing argument, is that this is a confession. All you really need to do is look at this as a confession. He says that the gun is his. And what the prosecutor says, and I've got the page references here, he says, he referred to the recording as a confession. And then at least twice, and maybe more than twice, pages 2023 and 2024, he says, if you listen to the recording, you'll hear, my prints are all over that gun. My prints are all over that gun. Well, that wasn't what Judge Mattis heard. And I submit to the court that if you listen to the recording, there is no possessory word. I, me, mine, my, my. There is no possessory word. And this court, this case, we did not cite this case in our brief. Vichit Vangsa, 819, Fed 3rd, 260. It's a case in which this court points out how important this error is because the court said, in a felon in possession case, the defendant's statement of ownership is especially incriminating and, this court said, is enough to tip the scale to sufficiency when there's a question of whether there's sufficient evidence. Well, there's no doubt that that's the case, but here's the thing. Generally, and in federal court, there's tons of recordings because of the electronic world in which we live. Yes, Your Honor. And this question of unintelligibility is one that comes up frequently. And the general resolution of it is, as long as you don't put a transcript in that says what, theoretically, the government wants it to say, the jury makes that decision. And I would suggest to you if the government based so much of their case on this so-called confession, and the jury found no confession, that that would inure to your benefit, not to your detriment. If the jury found no confession, that would inure to my benefit because I believe there would have been an acquittal in the case. But the jury heard it. The jury heard it after the prosecutor offered in his argument evidence. No. The jury heard that recording before the prosecutor's closing argument. The jury heard the recording played in court, yes. And they had it in the jury room. And they had it in the jury room after the prosecutor's closing argument and after the prosecutor said, you listen to it, it's a confession. He says, my prints are all over that gun. And I submit to the court that if you listen to the tape 50 times, there's no possessory word. The word my is not there. And I assume defense counsel stood up and said, listen to it. You're not going to hear that. I said, I believe my statement in closing argument was, listen to it, and I don't agree that you'll hear what the prosecutor says he will say. And I was the, what I felt constrained by in closing argument was at the pretrial conference, and this is, the order is part of the record. No, this is part of my brief, excuse me. That Judge Mattis says in talking to Mr. Poole and to me, he says, you can't say, give your opinion what's on the tape in closing argument, okay? So you need to, you need to think about what I'm saying. You've got to confine your closing argument to what's in evidence, okay? So, I mean, I feel constrained by that. I'm not going to say what, you know, I'm not going to say what I think is not in evidence. Yeah, but once the prosecutor did it, did you raise it? I know you didn't raise it during I objected. I mean, I objected to that, to his statement. Yes. Oh, at the time? At the, right before the, I objected, but rather than interrupt Mr. Poole. Right, well you anticipated it and the judge gave an order and then you alleged the prosecutor violated the order, but you didn't object at that point, right? I did not interrupt his argument to object. I objected before the argument and made it clear, I mean, I think I made it clear with Judge Mattis on the record that I was objecting to this being. You know, I understand that, but once the prosecutor violated it, in your view, did you approach the bench before you gave your closing? I don't believe I did. You know, I made an objection. I wanted to make sure I objected on the record and I'm running out of time. I think it's very important, let me just very briefly mention the second issue that I want to raise, which is issue number one, the sentencing issue. We rely on 18 U.S.C. 921A20. The issue is whether Tennessee cases, Tennessee cases that would not be used, could not be used by a Tennessee court to enhance a habitual criminal conviction in Tennessee, whether those cases can be used by a federal court to enhance my client's sentence under the ACCA. And we contend that all the, my time is up. Wait, I'm sorry, okay, and why couldn't they be used in Tennessee? They can't be used in Tennessee because they are void. Well, but they're void because he was given a concurrent rather than a consecutive sentence? Yes, Your Honor. Yes, Your Honor. And there are three cases cited, Clifton, Whaley, Posey. The Whaley case, I believe, is the best of those cases. And I'll have my five minutes. Thank you. Thank you. May it please the Court, my name is Chris Poole. I'm an Assistant United States Attorney from the Chattanooga office. Let me start, obviously, where the defendants start. I clearly disagree that there was insufficient proof that a rational juror could find the defendant guilty. As I argued it, and I also disagree that there was anything improper about my closing argument, but as I argued to the jury and in the brief, before you even get to the confession, there was a lot of circumstantial proof that the defendant possessed that firearm. You had him going back within 40 minutes after being told if he was there he was going to be arrested. You had the strong smell of marijuana, which you could see in the first video when the officer lets him go. He says several times how he smells the marijuana. And you have the officer saying that there was marijuana right on top of the gun there where it was found. You also had scales that had marijuana residue and a large amount of money. So, and this was the argument that I made to the jury. It's not a marijuana case, but there was strong, strong proof that he had the marijuana and the marijuana was sitting on top of the gun. Okay, so, but this is just a different issue, the issue that troubles me. The judge ruled on it. The judge said the jury can hear the tape, but you can't tell them what you think it says. So, why did you get up there and tell the jury that, that they were going to hear on the tape? And I told the jury probably five or six times to go back and listen to it and to decide for themselves what the tape said. And my understanding of the judge's ruling was my understanding was in line with what you're always supposed to do on closing argument, which is not to give personal opinion. And I think he specifically said this, Judge Mattis, you know, you can't get up there and say, I've listened to this 300 times, I think it says this. I never said, I think it said this. I think it was the same as arguing, if you've got a picture in and the clerk says, a picture of a bank robbery, and the clerk says, the person robbing me wore a green shirt, and you have a picture of the defendant wearing that shirt, you can say, look, here's the defendant in a green shirt. It was in evidence. All I did was say, this is what he says, go listen to it. And I kept saying, go back. You were told, don't say this is what it says. I disagree, Your Honor. Okay, what were you told? My understanding of it was, we were told not to say, I think it says this, or, I have listened to it. What does it mean, then, to say this is what it says? What's the basis for that? I've listened to it. My clerks listened to it. I think all of us listened to it. And the first time, I couldn't understand anything. After that, I started hearing things. I never heard the word, my. I mean, I heard, there are a few intelligible words. And that's why the judge told you not to do it. But then you go ahead and you say, listen, he says, my. And that's exactly what you were told not to do. Well, clearly, Your Honor, that's not how I understood it. But how could you say what it says and base it on anything other than what you heard when you listened to it? And what I can't understand is, it's in evidence. How can I not argue what the evidence is? And I don't think Judge Mattias ever said, you can't argue what the evidence is. And the defendant, like I said, said what he said on the tape. And I could not have pointed to the jury more times than I did that it is up to you to decide what he says and I want you to go back and listen and you decide and you stay back there as long as you need to until you're comfortable with what it says or does not say. But there has to be, I mean, the closing argument is, the evidence is here, this is what the evidence means. And I took Judge Mattias' ruling, and like I said, I think he specifically said, don't say you've listened to it a bunch of times and I know that it says this or try and put my expertise on it or my, or any kind of imprimatur of the government that, hey, believe me, I know what these kind of tapes say. I did not try to do that. I said, this is what it says, go listen to it and you decide what you think it says. And to me, you know, if I made a mistake, I certainly didn't mean to and I certainly didn't mean to disobey the court's order. The way I understood it is not to get up and say, hey, I know more than you, wink, wink, I know what he really says. It is, we heard the tape, this is what he says, but you go back and decide. And to me, that's what closing argument is. And Judge Mattias has never afterward in any of the filings or anything said that, and I realize there was not a contemporaneous objection, but this issue has been before the court. Judge Mattias did not say that I violated the order, did not calm me down. I mean, he was well aware of it. It's not like we hadn't argued it multiple times. Why wasn't, okay, I hear you. Why, as I understand it, the officer took pictures of the gun and said you could see fingerprints all over it and then he loses the pictures. No one ever does, dusts the gun for fingerprints. It's totally a constructive possession case. I mean, why wouldn't they have checked for fingerprints? Well, Judge, my response to that would be they, we, but they thought it was pretty clear that he admitted his prints were on it. Well, did you ever listen to the tape to see how garbled it was? We listened to the tape before we indicted it several times. And I mean, I'm familiar with covert tapes and confidential informant tapes and they're often garbled. And granted, I've listened to a lot of these tapes, which is why I didn't say to the jury, I've listened to a lot of these tapes, trust me. But I was comfortable, the officer was comfortable. They brought it to me saying he says my blank and blank prints are all over that blank. And I point this out to the jury. The timing of when he says that is important. I mean, he can see the officers there bending down and picking it up and he starts MF and prints all over MF and gun. I can't, and I think the jury reached this conclusion. I don't clearly, of the impression he was saying his prints were on it. So I do think you had strong circumstantial proof. And that's how I started this argument saying I think the proof was strong circumstantial that he had that gun, that was his gun he was going back to get. But I do think you can hear him on the tape say that his prints are on that gun. And so we did know that. The argument on the pictures to me is somewhat of a separate one than the prints. I mean, obviously, the officers could have printed the gun. Right, but why wasn't he entitled to the negative inference on the pictures? I think the case law is there has to be a showing that he intentionally got rid of this in order to deprive it from the defendant, that it hurt the defendant's case. I'm still not clear after all this time and reading the multiple filings and being there, how it could have come in any better than it did for the defendant with regard to cross-examining the officer. If the picture, and I thought this was important, I still think it's important, the picture was not of the crime scene. The picture was not of where the gun was found with the marijuana on it or leaves or whatever. This is basically, they could have taken a picture at the police station, it would have been the same thing. They had removed it, they're taking a picture separate from everything else. So we had the gun in, we could have taken a picture the day of, it would have been the same thing. So I don't understand how it could have helped their defense. If the picture looks like, hey, there's some prints on it, well, Mr. Moore did a good job of arguing to the jury, hey, you've seen the gun here today, it's been wiped clean, there are no prints on it. And the officer said, yeah, I thought I saw prints on it. I mean, that was in the record and it was on the video. So his argument that the police had, I basically tampered with evidence was the argument, was there in front of the jury, it was quite clear. So seeing a picture of prints would have been, the officer admitted that he saw prints. If there are no prints on the gun, I guess maybe it shows that the officer was wrong when he thought he saw prints. I don't know how that gets him anything any better. Mr. Moore, in this case, did a good job cross-examining the officer. As we brought out in our brief and it was argued below, before we ever got to trial, a couple months, Mr. Moore asked me again for the pictures. I went back to the agent at ATF and the officer and said, where are the pictures? And I had already asked them before, of course, and they said there are none. I went back to Mr. Moore and said, there are no pictures. Can you tell me if you're reading in it a report or something like that so I can find it and go confront them with it? He said, I didn't read it in a report. That was the email response, which was true. It was on a video well after the defendant was no longer on the video that he noticed it. And I think it's because he knew he had a strategic advantage at that point. He clearly crossed the officer where the officer says, I didn't take any photos, and he shows a video of him taking a photo. There's not much better cross-examination than that. Where the defendant had some trouble in this case is most everything was on video. So I think the officer was honest. I think the court found the officer was honest. But the jury could decide for themselves by everything they saw on the video and heard on the video what occurred out there. Well, the alleged spoilers wasn't it certain evidence was put on the hood of a car and he took a picture with his cell phone? That's exactly right, Your Honor. The evidence was what was on the hood of the car. Which was the fire. And that came into evidence. Absolutely. We put that into evidence. So if there's an issue here to me, and probably shouldn't even be interjected, but it seems like it's more of a Brady issue if that photograph showed no prints on the gun and you withheld that photograph, then you might have a Brady issue. But as far as the evidence goes, the evidence was what was on the hood of the car and that did come into evidence. Absolutely. Yes, sir. And that's why I pointed out to me the distinction between a picture of the crime scene, of where the gun was found in the condition before anybody picked it up. I mean, this has moved and there's police cars and lights and it's not back in the bushes where it was found. As I said, it'd be no picture. Once you got it back to the police station, well, we brought the gun in and we had the gun there. Is the condition the same? I mean, could they have lifted prints at that point or are they gone by then? They are supposed to, first of all, their policy is to make the gun safe, so they unloaded it. Is to make the gun safe, I'm sorry. To unload it to make sure it's unloaded. They're supposed to wear gloves and I think the testimony was that he believes Officer Atwell, Officer Piazza testified, but he said, I believe Officer Atwell followed procedure and did wear gloves when he unloaded it. They could have sent it for prints. Quite honestly, the percentages of coming back with prints on a gun are really, really, really low, but they could have done that. And they didn't do it. You have to sort of triage these cases for DNA and prints and where possession is more in question are certainly the cases they send first. Where they think the defendant, and I did too, and the jury apparently did too, where they think the defendant has said his prints are on the gun, it's probably not a case that rises right to the top of their list that says, hey, we need to figure out whose gun it is. They took it as a confession. That doesn't mean they shouldn't have done it. It doesn't mean they shouldn't have tested it. If it came back with prints, it did. If it didn't come back with prints, it didn't. If it has prints, how long does it stay? How long do the prints stay to be tested? Presumably if they're not wiped off or I don't know why they would go anywhere other than if they follow proper procedures as far as storing it and things of that nature, I don't think they should be here. But I don't have a scientific answer to that. We could have. We've tested guns later when defense counsels come to us and initially they said, the officer said, we're not going to test it. If defense counsels come back and said, hey, can you test it, we've sent it to the lab. Sometimes they've said, well, we can. Sometimes we can't. It depends on if you've done other testing, how they've kept it. So it's possible. Yes, ma'am. Or you don't test the gun because when it comes back with no prints, then the defense attorney says, they tested the gun and my client's prints weren't on it. So to avoid that dilemma, you don't test at all. But of course if they ask, we go back and ask them to test it. It's always a catch-22 with a gun in prints because there's always the argument they could have printed it, but they didn't because whatever, they knew his prints weren't on it. And then you never, you know, it's unfortunately not CSI or TV where there's always prints and there's always the, I've been gun prosecutor in the federal system for 15 years, the DA's office for four years before that. I could probably count on my one hand the times that we've gotten prints off a gun. But if the defense asks for it, we always send it and the lab can tell us whether or not they can get prints on it. There's also a reason for the defense not to ask it. When the defendant says my prints are on it, he probably doesn't want to find out if his prints really are on it. So in my mind the important issue is whether or not the defendant was admitting possession by thinking his prints were on it. Thinking my prints will be on anything I touch like a gun. And I think that's what the officers were thinking as well. And I'll answer obviously any other questions, but that's all I have. Thank you. Mr. Poole continues to argue that the defendant said his prints were on the gun. He never said my prints are on the gun. And as this court, the case that I mentioned to you earlier shows how important that possessory statement or the lack of that possessory statement is in a question of sufficiency of evidence. And all you have to do is look at the record and look at the closing argument. The closing argument, Mr. Poole says, this is page 2023, the recording says my prints are all over that further down. He admits his prints are on it. He's admitting that his prints are on the gun. Page 2024, he's there to get his gun. He says my prints are all over that gun. Further on in the argument, he tells you his prints are on it. He tells you, this is page 2038, excuse me. He tells you that his prints are on the gun. My prints are on that. Page 2039, my prints are all over that. He says my prints are all over it. Page 2040, blankety blank gun, my prints are all over it. You know, and it's a small point, but in addition to never saying, there's no possessory word on the recording, none at all. In addition to that, the word gun's not on the tape. The word gun is not on the tape. The word wand is on the tape. That was what the judge said when it was easily discernible to him, page 1207 of the record, he hears, Judge Mattis hears, expletive man, comma, mother, expletive, wand, prints all over this mother, expletive. It's not what the government argued. And back to the point argued earlier, what did the judge say? He said, in your opinion, what's on the tape, in closing argument. Okay. So you need to think about what I'm saying. You've got to confine your closing argument to what's in evidence. Okay. And the closing argument wasn't confined to what's in evidence. I mean, the larger question is, can he say what he thinks is on the tape? But if you get beyond that, he can't say that the tape says, my prints are all over that gun. It doesn't say that. That's, that is, those are facts not in evidence. Well, the tape was in evidence. The tape was in evidence. What was he, is there any point at which the jury could be told what either side contends the tape says? I would submit not. I would submit, I would judge, that under Judge Matias' instructions, I submit not. I think it's like, if you had a tape that was all static, that's all it was, just white noise, then I think it would be improper to say, if you listen to that tape, you're going to hear someone say, that was my gun. Because you can't hear anything on it. I think that would be, I think it's just as improper here to suggest that to the jury. Well, the difference is, though, the mistake in the first example, if it was all static, it would have been error for the judge to allow it to go to the jury in the first instance. It would have been. It would have been. And we, excuse me. This was in evidence. It was. And you can, both sides are always able to comment on what is in evidence on the thing. If it was a bank robbery and you had a security camera that showed a picture of the bank robber with a hood on his face and the teller, nonetheless, was able to say she could identify the defendant, the prosecutor could argue if the jury got to see that tape. You look at the tape, you decide, but the teller was there and she says, that was the defendant. That's permissible, isn't it? It is. I just see a difference between the photograph, and Mr. Poole used a photograph as an example. I had a hard time with this, trying to articulate. The tape is in evidence. The recording is evidence. Whatever is on that recording is in evidence. I was a prosecutor. You can comment on evidence. But here, where the judge said, confine your argument to what's in evidence, I submit that it was improper to argue words that are, that to judgmentize, to, excuse me, I'm running out of time, are completely not discernible on that tape. So if the court has any other questions, I'm glad to try to answer them. No, it seems not. Thank you all very much. Thank you, and the case is submitted. Mr. Moore, I know you took this case under the Criminal Justice Act, and I know you do that as a service to the court and to our system of justice, so we very much appreciate that. Thank you. Thank you very much. I just, when I got out of law school, my first job was clerking for Judge Miller in his last year in the district court, and this is certainly the last time I'm going to appear in this court, and I was struck by that when I came to the court. Thank you very much. There being no further cases for you, Mr. Moore, I'm going to ask